795 F.2d 252
 14 Soc.Sec.Rep.Ser. 192, Medicare&Medicaid Gu 35,482
Dale HILLBURN, by his parents and next friends Ralph and
Eleanor HILLBURN, James Corbett, by his next friend Roberta
Reid, Sandra Fuchs, by her mother and next friend Florence
Fuchs, Stephen Kaplanka and Mark Kaplanka, by their mother
and next friend Dorothy Napolitano,
Plaintiffs-Appellants-Cross-Appellees,
v.
Edward MAHER, Commissioner of the Connecticut Department of
Income Maintenance, and New Brook Hollow Health
Care Center, Inc., Defendants-Appellees,
Edward Maher, Commissioner of the Connecticut Department of
Income Maintenance, Defendant-Appellee-Cross-Appellant.
 Nos. 853, 897, Dockets 85-7900, 85-7908.
 United States Court of Appeals,
Second Circuit.
 Argued March 10, 1986.
Decided June 30, 1986.
 
 David C. Shaw, Hartford, Conn. (Trowbridge, Ide & Greenwald, P.C., Shelley White, Hartford, Conn., on brief), for plaintiffs-appellants-cross-appellees.
 Hugh Barber, Asst. Atty. Gen., Hartford, Conn. (Joseph I. Lieberman, Atty. Gen., Hartford, Conn., on brief), for defendant-appellee-cross-appellant.
 Public Interest Law Center of Philadelphia, Philadelphia, Pa. (Frank J. Laski, Judith A. Gran, Philadelphia, Pa. of counsel), filed a brief for amicus curiae The Ass'n for Retarded Citizens, Connecticut.
 Before KEARSE and CARDAMONE, Circuit Judges, and POLLACK, District Judge.*
 KEARSE, Circuit Judge:
 
 
 1
 Plaintiffs Dale Hillburn, et al., recipients of aid under the Medicaid program, Title XIX of the Social Security Act ("Title XIX" or "Medicaid Act"), as amended, 42 U.S.C. Secs. 1396-1396p (1982 & Supp. I 1983 & Supp. II 1984), who reside in "skilled nursing facilities" ("SNFs") in the State of Connecticut ("State"), appeal on behalf of themselves and a class of those similarly situated, from a final judgment entered in the United States District Court for the District of Connecticut after a bench trial before Jose A. Cabranes, Judge, granting the relief sought in their complaint to the extent of enjoining defendant Commissioner of the Connecticut Department of Income Maintenance (together "CDIM") to ensure that SNFs with which CDIM has Medicaid provider agreements provide appropriate adaptive wheelchairs and related services to members of the plaintiff class, and to take "corrective action as needed" against SNFs that fail to provide such wheelchairs and services. On appeal, plaintiffs contend principally that the district court's judgment is not broad enough and that the court should have considered plaintiffs' claims relating to essential programs other than adaptive wheelchairs and "order[ed CDIM] to implement the federal Medicaid law in Connecticut SNFs." CDIM cross-appeals, contending principally that the district court erred in finding its reviews of the care provided by SNFs inadequate, and that the injunction inappropriately requires CDIM to terminate its provider agreements with SNFs that fail to provide appropriate adaptive wheelchairs and related services even if the SNFs remain certified for participation in the Medicaid program by other regulatory bodies. We conclude that the injunction against CDIM was proper and that plaintiffs were not entitled to broader relief, and we accordingly affirm the judgment of the district court.
 
 I. BACKGROUND
 
 2
 As the term is used in the Medicaid Act, an SNF is, essentially, an institution whose staff includes at least one registered professional nurse full time, whose policies are developed with the advice of a group of professional personnel including at least one physician, and which is engaged primarily in providing skilled nursing care and related services to resident patients who require medical or nursing care. See 42 U.S.C. Sec. 1395x(j) (1982 & Supp. II 1984); id. Sec. 1396a(a)(28). Plaintiffs were, at the time this suit was filed, disabled residents of SNFs in Connecticut. The principal defendant, and the only party against which the district court's judgment is directed, is CDIM, which is the single Connecticut agency responsible for administering the State's Medicaid plan.
 
 
 3
 CDIM itself does not provide health care services but enters into "provider agreements" with Connecticut SNFs that are certified to participate in the Medicaid program. The provider agreements, which are renewed yearly, state that the SNF will provide care and services in conformity with Title XIX and will meet the conditions of participation detailed in regulations promulgated by the United States Department of Health and Human Services ("HHS"), see 42 C.F.R. Secs. 405.1101-405.1137 (1985).
 
 
 4
 Under the federal Medicaid laws, CDIM has two methods of making payment for SNF care: (1) payments to SNFs according to per diem rates for "skilled nursing facility services," as defined in 42 U.S.C. Sec. 1396d(f) and 42 C.F.R. Sec. 440.40(a) (1985), and (2) payments to suppliers for other Medicaid benefits. In general, CDIM pays SNFs for services rendered to Medicaid-eligible persons resident in such facilities principally on a per diem basis calculated with reference to the SNF's costs, which include expenditures not only for salaries, fees, supplies, staff training, and so forth, but also for equipment purchased by the SNF. Under this method of payment, CDIM's reimbursement of an SNF for a particular expenditure may take as long as 18 months. For certain equipment that may not fall within the definition of "skilled nursing facility services" (hereinafter "separate Medicaid benefits"), CDIM pays the supplier of the equipment directly, and the SNF incurs no cost.
 
 
 5
 An adaptive wheelchair is a piece of equipment designed to support and properly position the body of a disabled person; it is used for a person whose disabilities preclude the effective use of a standard wheelchair. An adaptive wheelchair must be designed with a particular individual in mind and is usually unsuitable for use by any other individual. Such wheelchairs have only recently become commercially available for adults and may be expensive to purchase and maintain.
 
 
 6
 A. The Complaint and CDIM's Revision of Policy
 
 
 7
 Prior to the commencement of this lawsuit in February 1982, CDIM's policy was to reimburse SNFs for the cost of adaptive wheelchairs as part of their per diem rates rather than to pay the suppliers of such chairs directly. The thrust of plaintiffs' complaint was that this policy had resulted in SNFs' failing to provide needed adaptive wheelchairs to their disabled Medicaid-eligible residents because the cost was great and the delay in reimbursement too long. Contending that CDIM's policy therefore violated Medicaid regulations, plaintiffs sued on behalf of themselves and a class eventually certified as
 
 
 8
 [a]ll Medicaid recipients residing in or admitted to Skilled Nursing Facilities in the State of Connecticut on or after February 18, 1982, who, under defendant's policies and practices, cannot obtain the adaptive wheelchairs necessary to maintain their health and insure their effective development.
 
 
 9
 Plaintiffs also complained that as SNF residents they were treated differently from Medicaid-eligible persons who did not reside in SNFs. For the latter group, CDIM paid the suppliers directly for needed adaptive wheelchairs. Plaintiffs contended that CDIM's policy of using only the per diem method of reimbursement for such chairs for Medicaid-eligible SNF residents thus discriminated against them in violation of Sec. 504 of the Rehabilitation Act of 1973, 29 U.S.C. Sec. 794 (1982 & Supp. II 1984), and the Equal Protection Clause of the Constitution.
 
 
 10
 The complaint principally sought injunctive relief requiring CDIM and SNFs to provide adaptive wheelchairs to members of the plaintiff class and to provide "related professional support services necessary to ensure that such adaptive wheelchairs are safely and properly used."
 
 
 11
 A five-day trial was held between December 17, 1982, and April 3, 1984, with substantial continuances on consent of the parties in an effort to promote settlement. After several days of trial had been completed, CDIM amended its policy in October 1983 (and modified it further in February 1984), undertaking to make payment directly to suppliers for the cost of adaptive wheelchairs for Medicaid-eligible SNF residents.
 
 
 12
 In light of its amended policy, CDIM moved in November 1983 for dismissal of the complaint, contending that its new payment system rendered the action moot. The district court denied the motion. It concluded that since, under the new policy, SNFs were given the responsibility for identifying those SNF residents who needed adaptive wheelchairs and for monitoring their use, "[i]t cannot be said with assurance that the new policy will cause adaptive wheelchairs to be provided to all members of the plaintiff class."
 
 
 13
 With its motion to dismiss, CDIM filed a motion in limine seeking to exclude all future evidence at trial "concerning the care, habilitation or development of retarded persons residing in [SNFs] ... unless such testimony is strictly limited to what professional services are required to 'adequately and safely use adaptive wheelchairs in nursing homes.' " The court stated that CDIM was perhaps attempting to tie plaintiffs too inflexibly to the language of the complaint, and it denied the motion without prejudice, noting that Fed.R.Civ.P. 1 provides that the Rules "shall be construed to secure the just, speedy, and inexpensive determination of every action," and that Fed.R.Civ.P. 8(f) provides that "[a]ll pleadings shall be so construed as to do substantial justice."
 
 
 14
 B. Plaintiffs' Efforts To Broaden the Scope of the Action
 
 
 15
 In June 1984, two months after the close of trial, plaintiffs moved to expand the definition of the plaintiff class in order to, inter alia, include in the class all persons who were or would be unable to obtain adaptive wheelchairs "as part of an overall therapeutic program that is necessary to maintain their health and insure their effective development." CDIM objected to this redefinition on the ground that it in effect sought to amend the complaint to expand plaintiff's claims into areas unrelated to adaptive wheelchairs; it argued that Fed.R.Civ.P. 15(b) did not authorize such a posttrial amendment of the complaint because these broader issues had not been tried with the express or implied consent of CDIM. The court denied plaintiff's motion to redefine the class insofar as it sought expansion of the class's substantive claims, noting that CDIM had "objected consistently to the introduction of evidence concerning programming to maximize the 'physical, mental and psychosocial functioning' of class members." The court expressly intimated no view as to the appropriateness of a properly filed motion to amend the complaint.
 
 
 16
 In October 1984, plaintiffs formally moved pursuant to Fed.R.Civ.P. 15(a) and (b) to amend the complaint, seeking principally to expand the action beyond the claims relating to adaptive wheelchairs and related services in order to demand "programming ... to maximize the physical, mental and psychosocial functioning" of class members. After receiving extensive oral argument and briefing, the court observed that the motion had been inexplicably delayed, without permission, until long after the trial had ended and the case had been submitted to the court for decision; that CDIM had objected at trial to the introduction of evidence relating to these broader issues and would be prejudiced by the amendment; and that the amendment might necessitate supplemental evidentiary proceedings. Concluding that "[r]e-opening discovery and trial of the action at this late date would not serve the interests of justice," the court denied the motion to amend the complaint.
 
 
 17
 C. The District Court's Findings, Conclusions, and Judgment
 
 
 18
 In a Memorandum of Decision dated July 17, 1985 ("Opinion"), the court ruled that plaintiffs were entitled to some relief, although most of their claims had been mooted by CDIM's new policy. First, the court found that adaptive wheelchairs are medical necessities for many severely disabled persons:
 
 
 19
 23. An adaptive wheelchair can be helpful in preventing the development of contractures.... Adaptive wheelchairs also reduce pain and discomfort caused by improper body positioning, and promote skin integrity by alleviating pressure points.... By providing appropriate body alignment, adaptive wheelchairs also facilitate safe and proper breathing, swallowing, and digestion....
 
 
 20
 24. For many severely disabled persons, including some residents of SNFs, adaptive wheelchairs are a medical necessity.... Failure to provide an adaptive wheelchair can lead to deterioration of health and skills, and increases the risk of injury and death....
 
 
 21
 25. An individual who needs an adaptive wheelchair and does not have one will not be able fully to benefit from the physical therapy that is necessary to promote his health and physical well-being. ... For this reason, some class members receive little or no needed physical therapy....
 
 
 22
 26. Many residents of SNFs who have been provided with adaptive wheelchairs have exhibited noticeable improvement as a direct result of using their adaptive wheelchairs....
 
 
 23
 Opinion at 15-16. The court concluded that "the prescription of an adaptive wheelchair, like that of any necessary item of medical care, is a service that the SNF is required to provide as a condition of participation in the Medicaid program." Id. at 38.
 
 
 24
 The court held that insofar as plaintiffs had challenged CDIM's failure to pay suppliers directly for adaptive wheelchairs for Medicaid-eligible SNF residents, their claims were mooted by CDIM's 1983 amendment to its policy. The court decided, however, to construe the complaint as asserting also that CDIM had violated pertinent Medicaid standards by failing to ensure that SNFs properly (a) evaluated class members for appropriate adaptive wheelchairs and (b) provided appropriate services related to such wheelchairs. As thus construed, the complaint was not mooted by CDIM's new policy. Under that policy, the SNFs, not CDIM, had the responsibility for identifying SNF residents needing adaptive wheelchairs, performing interdisciplinary assessments of each resident's need, training their staffs in the safe and efficient use of such wheelchairs, and monitoring the residents who receive such chairs. The court noted that the costs incurred by SNFs in meeting these responsibilities would be reimbursed as part of their per diem rates, with the usual delays, and hence there still might exist some disincentive for SNFs to seek adaptive wheelchairs for their residents who are Medicaid recipients.
 
 
 25
 The court concluded that CDIM had failed to comply with its obligations under federal law to ensure the adequacy of the SNFs' provision of such wheelchairs and services. It noted that CDIM is obligated by 42 C.F.R. Secs. 456.600-456.614 (1985) to have medical review teams make periodic inspections of the adequacy of the care and programs provided by SNFs with which CDIM has provider agreements, and to have these teams report on "(1) 'the adequacy, appropriateness and quality of all services provided in the facility or through other arrangements, including physician services to recipients,' and (2) '[s]pecific findings about individual recipients in the facility.' 42 C.F.R. Sec. 456.611." Opinion at 40. It noted further that CDIM is required to " 'take corrective action as needed based on the report and the recommendations of the team....' 42 C.F.R. Sec. 456.613." Opinion at 40.
 
 
 26
 The court found that, notwithstanding these requirements, CDIM's medical review teams made no effort to assess the appropriateness of the plan of care ordered by a physician for an SNF resident and hence CDIM could not properly evaluate the adequacy of care provided by SNFs. Thus, the court concluded that CDIM had failed to comply with its obligations under federal law to ensure the adequacy of the services provided by the SNFs with which it had provider agreements.
 
 
 27
 Accordingly, the court entered judgment against CDIM ("Judgment"), enjoining it principally.
 
 
 28
 (1) to ensure that its medical review teams, in the course of the required inspections of the adequacy of care provided by SNFs, inspect and determine whether or not participating SNFs have (a) adequately evaluated class members' needs for adaptive wheelchairs, and (b) arranged for the provision of such chairs and for related services necessary to ensure the safe and adequate use of such chairs in SNFs for class members who require such services; and
 
 
 29
 (2) to "take corrective action as needed" if its medical review team finds that a participating SNF has failed adequately to assess the need for, provide, or provide needed services with respect to, adaptive wheelchairs for its resident Medicaid recipients.
 
 
 30
 The Judgment defines "corrective action as needed," which is not defined in the regulations, to "include[ ] those steps which [CDIM], or [its] designees, deem to be reasonable to ensure that [SNFs] provide adaptive wheelchairs and related services to class members, including, but not necessarily limited, to:" (1) consultation with the medical staff of the SNF, (2) requesting peer review by appropriate medical societies, and (3) filing complaints with appropriate State agencies such as the Connecticut Department of Health Services ("CDHS"), which could lead to the decertification of the SNF as a Medicaid provider. Judgment at 9-11.
 
 
 31
 Finally, the Judgment provides that if the corrective action taken or initiated by CDIM fails to remedy the failure of a participating SNF to provide an appropriate adaptive wheelchair, or related services necessary to ensure its safe and adequate use, to one or more Medicaid recipients residing in the facility, CDIM
 
 
 32
 shall terminate the facility's provider agreement [with CDIM,] notwithstanding the fact that the facility is otherwise certified to participate in the Title XIX Medical Assistance Program by [CDHS] or [HHS] pursuant to the provision of 42 U.S.C. Sec. 1396a(a)(9), 42 U.S.C. Sec. 1396a(a)(33), 42 U.S.C. Sec. 1396a(i), 42 U.S.C. Sec. 1396i, 42 C.F.R. Sec. 440.40 and 42 C.F.R. Sec. 442.1-442.202, and there is no other basis in federal law (such as violation of civil right requirements) for a termination of the provider agreement.
 
 
 33
 Judgment at 12-13. The Judgment provides that any such termination "shall comply with the procedural requirements of federal law, including the requirements of notice and an opportunity for an administrative hearing by the facility. See 42 C.F.R. Sec. 431.151-Sec. 431.154." Judgment at 13.
 
 D. Issues on Appeal
 
 34
 Plaintiffs seek affirmance of the Judgment so far as it goes, but they have appealed, contending principally that the district court erred in granting them only narrow relief. They argue that the court should have (1) made a finding of fact that the health of class members had deteriorated as a result of their failure to receive adaptive wheelchairs, (2) issued a broad injunction requiring CDIM to "implement the federal Medicaid law in Connecticut SNFs," and (3) permitted them to amend the complaint to allege claims extending to programs and services other than those related to adaptive wheelchairs. CDIM has cross-appealed, contending principally that the district court erred (1) in finding that CDIM's reviews of SNF care have failed to meet federal Medicaid standards, and (2) in enjoining CDIM to terminate its provider agreements with noncompliant SNFs that continue to be certified for Medicaid participation by HHS or CDHS.
 
 
 35
 For the reasons below, we find merit in none of the arguments advanced in support of the appeal or the cross-appeal. We turn first to the cross-appeal issues, to determine whether such relief as was granted was proper, and then to the appeal issues, to determine whether the denial of additional relief was proper.
 
 II. CDIM'S CONTENTIONS
 
 36
 The principal issues presented by CDIM's cross-appeal are whether the district court erred in ruling that the reviews conducted by CDIM's medical review teams failed to comply with Medicaid regulations, and whether the court could properly require CDIM to terminate its provider agreements with SNFs that fail to provide appropriate care for their Medicaid-eligible residents but continue to be certified by HHS or CDHS to participate in the Medicaid program. We find no clear error in the court's findings of fact, nor any misapplication of legal principles, nor any abuse of discretion in its fashioning of remedy.
 
 
 37
 A. The Finding of Inadequate CDIM Review of SNF Care
 
 
 38
 CDIM contends that the district court erred in ruling that the reviews of the care provided by SNFs conducted by CDIM's medical review teams failed to comply with federal law. We find no error.
 
 
 39
 The court found that although the evidence at trial was insufficient to show that the infrequency with which CDIM reviews were conducted violated Medicaid regulations, the evidence was ample to show that the content of those reviews failed to meet the requirements of federal law. The court's findings of fact with respect to the substance of CDIM's reviews of the adequacy of the care provided by SNFs included the following:
 
 
 40
 (1) that CDIM has entered into an agreement with CDHS which requires CDHS to perform periodic survey and certification inspections of SNFs participating in the Medicaid program. The purpose of these inspections is to determine whether such SNFs satisfy the conditions prescribed by HHS for participation in the program;
 
 
 41
 (2) that the survey teams sent out by CDHS determine whether assessments prescribed by SNF physicians have been performed, whether a physician has approved a plan of care, and whether the plan of care is being executed; but they do not attempt to assess whether the plan of care ordered by the SNF physician is appropriate;
 
 
 42
 (3) that if the CDHS review team finds deficiencies affecting the SNF population as a whole, they will prepare reports that could lead to the decertification of the SNF; but they do not report deficiencies that affect only a single SNF resident; and
 
 
 43
 (4) that CDIM's own medical review teams also review physicians' orders for Medicaid recipients and determine whether the physician's orders are being executed; but they, like the CDHS survey teams,
 
 
 44
 do not attempt to assess the appropriateness of the physician's orders.... Accordingly, if the physician of an SNF resident has ordered that the resident be assessed for an adaptive wheelchair, [C]DIM's inspection teams determine whether the assessment has been conducted. If no assessment has been ordered by a physician, the teams do not attempt to determine whether the resident has been assessed for an adaptive wheelchair, or whether such an assessment would be appropriate.
 
 
 45
 Opinion at 23. The court found that if a CDIM review team finds a deficiency and the SNF fails to correct it, CDIM will discuss the matter with the SNF's administrators; but CDIM "takes no action to compel the SNF to correct the deficiencies." Id.
 
 
 46
 The court noted that 42 C.F.R. Sec. 456.611 requires that a Medicaid agency's review team make "inspection reports [that] contain 'observations, conclusions and recommendations' concerning 'the adequacy, appropriateness and quality of all services provided in the facility ... including physician services ... [,]' 42 C.F.R. Sec. 456.611 ...," Opinion at 41 (emphasis in Opinion), and that the agency is required to determine "whether the 'services available in the facility' are adequate 'to meet [each resident's] current health needs and promote his maximum physical well-being,' " id. at 42. It concluded that since CDIM's inspection teams did not, as a general matter, attempt to determine whether SNF residents have been properly evaluated for adaptive wheelchairs, CDIM was not providing the supervision of SNF health care required by federal law.
 
 
 47
 We find no error in the above findings of fact, and, indeed, CDIM, could hardly contend that they were erroneous: It entered into stipulations that squarely support them. Rather, CDIM contends that in seeking to determine what observations and evaluations CDIM's medical review teams were required by law to make, the court should not have looked to Sec. 456.611 of 42 C.F.R., which is entitled "Reports on inspections," but rather should have looked to Secs. 456.609 and 456.610, which are entitled, respectively, "Determinations by team," and "Basis for determinations." It argues that under the latter provisions, its reviews were not defective. This argument is poorly conceived and ill supported.
 
 
 48
 First, in stating the requirements for the contents of review team reports, Sec. 456.611 can hardly be thought to require that the report be more extensive than the investigation; if the matter must be reported, it must first be investigated. Thus the court did not err in looking to Sec. 456.611 for guidance as to the requirements for the contents of the investigation. Further, the sections relied on by CDIM do not show that review teams are not required to evaluate the adequacy, appropriateness, and quality of all services, including physician services. Section 456.610 sets forth a number of items the team "may" consider; it does not purport to state that there are no other items that the team should consider. Certainly such a list of possible considerations cannot be read as nullifying express statements in other sections as to what must be determined. Section 456.609 is even less helpful to CDIM, for both its language and its effect appear to have been recognized by the court. That section states that
 
 
 49
 [t]he team must determine in its inspection whether--
 
 
 50
 (a) The services available in the facility are adequate to--
 
 
 51
 (1) Meet the health needs of each recipient, ...; and
 
 
 52
 (2) Promote his maximum physical, mental, and psychosocial functioning.
 
 
 53
 Although the district court's opinion did not include a citation to Sec. 456.609, the court's recognition that the review teams must "determine whether the 'services available in the facility' are adequate 'to meet [each resident's] current health needs and promote his maximum well-being,' " Opinion at 42, virtually recites the language of that section. And, as the court found, CDIM's team reviews could not meet these requirements: Since the team makes no attempt to determine whether it would have been appropriate to evaluate a given patient for an adaptive wheelchair--a device that is a medical necessity for some SNF residents--the team cannot determine whether the SNF's service, in light of its failure to make such an evaluation, was adequate to meet the health needs of the patient.
 
 
 54
 We conclude that the district court neither erred in its findings of fact nor failed to apply the correct legal standards, and that there is no basis for overturning its conclusion that CDIM's inspections did not comply with federal law.
 
 
 55
 B. The Propriety of the Injunction Requiring CDIM To Terminate Its Provider Agreements With Irremediably Noncompliant SNFs
 
 
 56
 CDIM also contends that the district court "clearly erred by ordering [CDIM] to terminate Title XIX provider agreements with SNFs based on the findings of [CDIM's] patient review teams on individual class members when the facility is certified to participate in" the Medicaid program. In support of this challenge, CDIM points out that Title XIX "links nursing facility participation in the program to the certification decision of [CDHS] or [HHS]," that CDIM is not the agency that makes certification determinations, and that CDIM thus cannot be required to terminate its provider agreements with SNFs that are certified. We are unpersuaded.
 
 
 57
 First, as a practical matter, we note that CDIM appears to ignore the major thrust of the injunction entered against it. The Judgment does not require CDIM instantly to terminate a provider agreement upon the report of its review team that SNF care with regard to adaptive wheelchairs is inadequate. Rather, CDIM is enjoined to "take corrective action as needed" to attempt to remedy the deficiency. The Judgment defines "corrective action as needed" to include consultation by CDIM officials with the management of the SNF, the solicitation of peer review from medical societies, and the filing of complaints with other state agencies that could lead to the decertification of the SNF as a Medicaid provider. Only if the corrective actions taken or initiated by CDIM fail to induce the SNF to bring its services relating to adaptive wheelchairs into compliance with the law does the Judgment require CDIM to terminate its provider agreement with the SNF. The Judgment thus seems a prudent exercise of the district court's discretion, and we find nothing in the Medicaid scheme that prohibits it.
 
 
 58
 The fact that CDIM is not the agency responsible for certification of facilities as Medicaid providers is of no consequence. As the district court noted, the reason for the requirement that a state designate a "single State agency" to administer its Medicaid program, see 42 U.S.C. Sec. 1396a(a)(5); 42 C.F.R. Secs. 431.1 and 431.10 (1985), was to avoid a lack of accountability for the appropriate operation of the program. See generally S.Rep.No. 404, 89th Cong., 1st Sess. (1965), reprinted in 1965 U.S.Code Cong. & Ad.News 1943, 2016-17 (suggesting that certain provisions of Medicaid bill were intended to achieve "simplicity of administration" and "assurance ... that the States will not administer the provisions for services in a way which adversely affects the availability or the quality of the care to be provided."). CDIM, as the single agency designated by Connecticut, retains the authority to "[e]xercise administrative discretion in the administration or supervision of the plan," and to "[i]ssue policies, rules, and regulations on program matters." 42 C.F.R. Sec. 431.10(e). These regulations do not permit CDIM's responsibility to be diminished or altered by the action or inaction of other state offices or agencies. Id.
 
 
 59
 Nor does CDIM's argument that certification is required before CDIM may enter into provider agreements carry the day. Although CDIM is prohibited from entering into such agreements with SNFs that are not certified, see, e.g., 42 C.F.R. Sec. 442.12(a) (1985), we find nothing in the Medicaid scheme that requires CDIM to maintain a provider agreement with an SNF simply because it is certified. Indeed there are provisions that suggest precisely the contrary. Sections 431.151-431.154 of 42 C.F.R., for example, set out the appeal procedures that the state must make available to an SNF when the state has terminated "certification or a provider agreement for the Medicaid program," id. Sec. 431.151 (emphasis added). Given that there can be no lawful provider agreement with a facility that is not certified, if the provider agreement could not be terminated while a facility remained certified, the use of the disjunctive in Sec. 431.151 et seq. would be meaningless.
 
 
 60
 More to the point of the substantive issue here, 42 C.F.R. Sec. 442.12(d) (1985), as the district court noted, expressly allows the single state agency responsible for administering the Medicaid program to terminate, for good cause, a provider agreement with a certified SNF. That section provides as follows:
 
 
 61
 (d) Denial for good cause. (1) If the Medicaid agency has adequate documentation showing good cause, it may refuse to execute an agreement, or may cancel an agreement, with a certified facility.
 
 
 62
 (2) A provider agreement is not a valid agreement for purposes of this part even though certified by the State survey agency, if the facility fails to meet the civil rights requirements set forth in 45 CFR Parts 80, 84, and 90.
 
 
 63
 (Emphasis in text added.) CDIM contends that this provision does not authorize the district court's injunction that CDIM terminate provider agreements with SNFs as to which corrective action relating to adaptive wheelchairs has failed, because the section applies only to considerations unrelated to quality of care, such as civil rights requirements. We see no basis in law or in reason to find Sec. 442.12(d)(1) so limited. The very purpose of the Medicaid program is to provide the needy with medical assistance, and many of Title XIX's provisions are plainly designed to enhance the quality of care that is provided. Certainly the language of the section does not suggest that poor quality health care cannot be good cause for termination; and if the provision of poor quality health care cannot constitute good cause for the termination, the goal of the Medicaid program is thwarted.
 
 
 64
 Thus, we conclude that the Medicaid scheme did not preclude the relief fashioned by the district court. To the extent that a facility engaged to provide appropriate medical care fails to do so and cannot be persuaded to do so by such methods as consultation or the commencement of decertification proceedings, its provision of inadequate care and services may be found to constitute good cause for termination of the provider agreement. The Judgment's requirement that CDIM terminate its provider agreements with such recalcitrant SNFs was not improper.
 
 
 65
 We have considered all of the arguments advanced by CDIM in support of its cross-appeal and have found them to be without merit. We conclude that the Judgment of the district court is proper as far as it goes, and we turn now to plaintiffs' contentions that the Judgment did not go far enough.
 
 III. PLAINTIFFS' CONTENTIONS
 
 66
 Plaintiffs, while urging us to affirm the Judgment to the extent that it grants them relief, contend that the district court should have granted broader relief in their favor, and they ask that we "remand this case to the district court with instructions to order the defendant to implement Subpart I of 42 C.F.R. part 456 [i.e., Secs. 456.600-456.614] fully and effectively." In support of their appeal, they contend (1) that the district court erred in failing to find that the health of class members had deteriorated for want of adaptive wheelchairs; (2) that their complaint as filed was broad enough to justify the granting of more extensive relief; and (3) that if the complaint as filed was not broad enough, the court should have granted their motion to amend. We have considered all of plaintiffs' arguments in support of a broader judgment and find no merit in any of them.
 
 
 67
 A. The District Court's Findings as to Injury
 
 
 68
 In its assessment of the evidence at trial, the district court stated that
 
 
 69
 it cannot be determined, on the basis of credible evidence in the record of this case, whether and to what extent the health of any particular class member has deteriorated since his admission into an SNF as a result of the SNF's failure to provide him with an adaptive wheelchair.
 
 
 70
 Opinion at 16. Plaintiffs contend that the "court's failure to make any finding in this respect is ... clearly erroneous." Even if accepted, this contention provides no ground for a remand.
 
 
 71
 As detailed in Part I.C. above, the court found, inter alia, that adaptive wheelchairs were, for many severely disabled persons, a medical necessity that SNFs are required to provide. It found that CDIM's medical review teams did not adequately determine whether SNFs provided appropriate adaptive wheelchairs and related services to their Medicaid patients who need them. And on the basis of these findings, the court entered its Judgment enjoining CDIM to ensure that class members are properly evaluated for, provided with, and monitored for the safe and productive use of, appropriate adaptive wheelchairs.
 
 
 72
 We are hard pressed to see how an additional finding by the court that the failure of SNFs to provide adaptive wheelchairs had actually caused harm to the health of particular class members would have resulted in the granting of any additional relief. Plaintiffs' complaint made no demand for damages; it requested injunctive and declaratory relief; and its requests were focused squarely on the provision of adaptive wheelchairs and services related thereto, see Part III.B. below. Much of the relief sought was forthcoming as a result of CDIM's post-complaint change of policy with respect to its method of payment for such wheelchairs; the remainder was granted by the Judgment that was entered. Thus, even were we to view as error the court's failure to make the finding requested by plaintiffs, we could not find that that failure resulted in any flaw in the Judgment.
 
 B. The Appropriate Breadth of the Relief
 
 73
 We likewise find no merit in plaintiffs' contention that the district court should have enjoined CDIM generally to "implement the federal Medicaid law in Connecticut SNFs," or to take steps to ensure that SNFs provide appropriate programming and services for all the needs of class members, not just the needs relating to adaptive wheelchairs. The court appropriately tailored the relief to the issues that were properly before it.
 
 
 74
 As the district court noted,
 
 
 75
 [i]n the early stages of this litigation, the dispute focused on [C]DIM's refusal to pay, as a separate Medicaid benefit, for adaptive wheelchairs for disabled residents of SNFs. All four counts of the Complaint, and all of the pretrial memoranda and proposed findings, address exclusively the issue of providing adaptive wheelchairs to class members.
 
 
 76
 Opinion at 6 (footnotes omitted). Plaintiffs' demands for relief were similarly focused. Aside from requesting costs, attorneys' fees, and "such further relief as the Court deems just," the complaint requested only that the court
 
 
 77
 1. Preliminarily and permanently enjoin the defendants to provide adaptive wheelchairs to handicapped persons living in nursing homes in Connecticut and any related professional support services necessary to ensure that such adaptive wheelchairs are safely and properly used.
 
 
 78
 2. Declare unconstitutional and unlawful under Section 5 of the Rehabilitation Act of 1973 the failure of defendants to provide adaptive wheelchairs to severely handicapped persons living in nursing homes.
 
 
 79
 3. Declare unconstitutional and unlawful under Section 5 of the Rehabilitation Act of 1973 the failure of defendants to provide treatment necessary to adequately and safely use adaptive wheelchairs in nursing homes.
 
 
 80
 4. Declare unlawful under the Social Security Act and regulations promulgated thereunder the refusal of the defendants to provide adaptive wheelchairs to handicapped persons living in nursing homes in Connecticut.
 
 
 81
 5. Declare unlawful under the Social Security Act and regulations promulgated thereunder the failure of the defendants to provide the related professional services necessary to adequately and safely use adaptive wheelchairs in nursing homes.
 
 
 82
 6. Preliminarily and permanently enjoin defendants to submit to plaintiffs and to the Court for its approval a plan to implement the aforesaid.
 
 
 83
 7. Enter an order certifying the class of persons plaintiffs represent to include all handicapped persons living in skilled nursing facilities in Connecticut who are, under defendants' policies and practices, ineligible for the adaptive wheelchairs necessary for their health and effective development.
 
 
 84
 8. Enter an order certifying the defendant class to include all skilled nursing facilities housing handicapped persons who need adaptive wheelchairs if thier [sic ] health and developmental needs are to be properly addressed.
 
 
 85
 The district court noted that plaintiffs had attempted to expand their case midway through trial, "[perhaps] prompted in part by [C]DIM's amendment in October 1983--twenty months after the commencement of this suit--of its policy concerning adaptive wheelchairs." Opinion at 6. This attempted expansion took the form of efforts to introduce at trial, over CDIM's objection, evidence of inadequacy of SNF care unrelated to adaptive wheelchairs. The complaint was not amended. Indeed, as discussed in Part III.C. below, plaintiffs made no motion to amend the complaint until long after the trial had ended.
 
 
 86
 In the absence of a proper amendment to the complaint, the district court was fully justified in tailoring the relief granted to the demands set forth in the complaint.
 
 
 87
 C. The Denial of the Motion To Amend the Complaint
 
 
 88
 Finally, plaintiffs contend that if their complaint as filed was not sufficiently broad to warrant the granting of relief unrelated to adaptive wheelchairs, the district court was required to permit them to amend the complaint to state broader claims. We reject this contention.
 
 
 89
 As a general matter, "[t]he district court has discretion whether or not to grant leave to amend, and its decision is not subject to review on appeal except for abuse of discretion...." 3 Moore's Federal Practice p 15.08, at 15-64 (2d ed. 1985) (footnotes omitted); see Foman v. Davis, 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962). In exercising its discretion, the district court is required to heed the command of Rule 15(a) to grant leave to amend "freely ... when justice so requires." Fed.R.Civ.P. 15(a); Foman v. Davis, 371 U.S. at 182, 83 S.Ct. at 230; 3 Moore's Federal Practice p 15.08, at 15-65. Both this general principle and explicit guidelines for amendment of pleadings after the start of trial, provided in Rule 15(b), inform the district court's exercise of its discretion. Rule 15(b) provides as follows:
 
 
 90
 (b) Amendments to Conform to the Evidence. When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings. Such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues may be made upon motion of any party at any time, even after judgment; but failure so to amend does not affect the result of the trial of these issues. If evidence is objected to at the trial on the ground that it is not within the issues made by the pleadings, the court may allow the pleadings to be amended and shall do so freely when the presentation of the merits of the action will be subserved thereby and the objecting party fails to satisfy the court that the admission of such evidence would prejudice him in maintaining his action or defense upon the merits. The court may grant a continuance to enable the objecting party to meet such evidence.
 
 
 91
 The import of Rules 15(a) and (b) combined is that (1) a motion to amend the pleadings to conform them to the evidence may be made at any time; (2) if the motion is made during trial, either in response to an objection to evidence concerning issues not raised by the pleadings or without such an objection, it may be granted if the party against whom the amendment is offered will not be prejudiced by the amendment, and it should be granted in the absence of prejudice if the interests of justice so require; (3) if the motion is made after trial, and the issues have been tried with the express or implied consent of the parties, the motion must be granted; (4) if the motion is made after trial, and the issues have not been tried with the express or implied consent of the parties, the motion may be granted if the party against whom the amendment is offered will not be prejudiced by the amendment and should be granted in the absence of such prejudice if the interests of justice so require.
 
 
 92
 Within this framework, the district court's denial of plaintiffs' motion to amend the complaint was not an abuse of discretion. The court properly found that issues as to care unrelated to adaptive wheelchairs were not raised by the complaint and were not tried with the consent of CDIM, either express or implied. Thus, the court was not required to allow the amendment unless it found there would be no prejudice to CDIM and that the amendment would be in the interests of justice.
 
 
 93
 The court found that the proposed amendment would have substantially altered and expanded the nature of plaintiffs' action and that CDIM would therefore be prejudiced by the proposed amendment since CDIM had called witnesses only to defend the issues framed by the complaint, i.e., that in order to meet the health needs of the class members, SNFs were required to provide appropriate adaptive wheelchairs and the related support services necessary to ensure the safe and adequate use of such chairs. CDIM had presented no evidence with respect to other programs for class members "to maximize [their] physical, mental and psychosocial functioning." Thus, CDIM would be prejudiced by the posttrial amendment to introduce these broader claims. These findings were not erroneous, and the court's denial of the motion to amend on the ground that the amendment would prejudice CDIM was appropriate. See, e.g., Browning Debenture Holders' Committee v. DASA Corp., 560 F.2d 1078, 1086 (2d Cir.1977) (upholding denial of posttrial amendment that would have added a new claim, the issues as to which had not been tried).
 
 
 94
 The court also found that the interests of justice did not require that the amendment be allowed, noting, inter alia, that CDIM had objected to evidence on these expanded issues at trial, that plaintiffs had made no motion to amend the complaint during trial in response to these objections, and that they had delayed, without leave or explanation, until long after the trial ended and the case had been finally submitted to the court for decision, to make their motion to amend. In all the circumstances, we conclude that the denial of plaintiffs' belated motion to amend the complaint in order to assert new and broader claims against CDIM was not an abuse of discretion.
 
 CONCLUSION
 
 95
 The judgment of the district court is in all respects affirmed.
 
 
 
 *
 Honorable Milton Pollack, Senior Judge of the United States District Court for the Southern District of New York, sitting by designation