Jeffrey ALLEN, Plaintiff,

v.

Agnes MANSOUR, et al., Defendants.

Civ. A. No. 86–73429.

United States District Court,
E.D. Michigan, S.D.

Nov. 12, 1986.

Candace A. Crowley, Wayne County Neighborhood Legal Services, Kathleen A. Gmeiner, Michigan Legal Services, Elizabeth L. Gleicher, Goodman, Eden, Millender & Bedrosian, Detroit, Mich., for plaintiff.

William R. Morris, Asst. Atty. Gen., Lansing, Mich., for defendants.

## MEMORANDUM OPINION AND ORDER

PHILIP PRATT, Chief Judge.

Jeffrey Allen brings this action against various officials of the State of Michigan, requesting both injunctive relief and money damages.[1] Allen claims that the Michigan Medicaid patient selection criteria for extrarenal transplants violates (1) the provisions of the federal medicaid statute, 42 U.S.C. § 1396a; (2) the Fourteenth Amendment of the United States Constitution; and (3) the Michigan Administrative Procedures Act, M.C.L.A. 24.201 *et seq.*

This action was tried before the court without a jury. The following opinion contains the court's findings of fact and conclusions of law.

### FINDINGS OF FACT

Jeffrey Allen is a 27 year-old male suffering from end-stage liver disease. The cirrhosis of the liver which is threatening his life stems from consumption of alcohol. His past behavior exhibits symptoms of alcoholism, but he has abstained from the use of alcohol since early March, 1986, a period of more than seven months.

After extensive suffering from ascites, fluid retention and repeated gastrointestinal bleeding, Mr. Allen was referred by doctors at Henry Ford Hospital to the University of Chicago for consideration for liver transplantation. He was admitted to University of Chicago on June 26, 1986, and underwent a battery of examinations. These examinations revealed obvious jaundice, severe abdominal distention, very high levels of bilirubin, as well as other symptoms of end-stage liver disease. The treating physicians at that time indicated a less than five percent chance of one year survival if Mr. Allen did not receive a liver transplant.[2] Testimony at trial revealed that Mr. Allen may suffer life threatening complications at any time.

On July 3, 1986, the plaintiff, through his physicians, applied to the Michigan Department of Social Services (DSS) for a prior authorization from the state medicaid plan to fund a liver transplant at the University of Chicago.[3] The DSS distributed the relevant materials to a panel of eleven Michigan doctors, all familiar with renal or extrarenal transplantation. After polling four of these doctors, the DSS denied the application on July 29, 1986. The primary reason for the denial was a requirement of the patient selection criteria adopted by the State of Michigan that a prospective liver donee applicant suffering from alcoholic cirrhosis must have a documented two-year period of abstinence from alcohol.[4] Having abstained from alcohol for only four months at the time of application, Allen failed to meet this criterion.

During pretrial proceedings, the defendants indicated that the DSS would entertain a second application by Allen. They stated that circumstances may have changed, and the DSS might approve a reapplication. In late September the court directed Allen to reapply for a prior authorization. On October 16, 1986, the DSS denied this second application on grounds similar to those in the first denial.[5] The second denial did not

---

1. The hearings before this court revolved around issues of liability and the need for injunctive relief. The damages claim was bifurcated from the request for injunctive relief, and will be decided at a later date.

2. Deposition testimony by a treating physician suggested that Allen has a 15% chance of surviving from one to two years. His need for a liver transplant, however, is not disputed in this proceeding.

3. The University of Chicago is a major liver transplant center in the United States. The availability of livers for transplantation is not an issue in this case, the supply being more than adequate to satisfy demand in Illinois and, as a matter of fact, in Michigan.

4. Although the letter denying funding indicated that infections and other factors concerned the doctors who considered the application, at trial it was apparent that the alcohol abuse was the key factor in the decision to deny the application. The court will focus on this criterion and the plaintiff's challenge to it.

5. After trial, the defendants moved the court to make part of the record documents related to the October 16 denial. These documents have been admitted and have been given due consideration in formulating the Court's decision.

refer directly to the two-year abstinence requirement, but instead indicated that Allen's history of substance abuse was "too recent." The denial invited yet another reapplication, requesting an evaluation by a "psychiatric consultant experienced in the field of alcoholism and active in a program which is transplanting patients with alcoholism." Such an evaluation was requested despite the inclusion in the reapplication of a report on Allen by Dr. Robert Niven, Medical Director of Substance Abuse Services at Harper Grace Hospital in Detroit. Dr. Niven, widely experienced in treating alcoholism, considers Allen's chance of relapse after a liver transplant to be "minimal."

The process which resulted in the challenged patient selection criteria began in 1984 with a request from the Governor's Office of Medical Affairs. The State requested the Michigan State Medical Society (MSMS) to formulate guidelines for extrarenal organ transplantation, with the eventual goal of coordinating the criteria for such transplants throughout Michigan. The MSMS established an Ad Hoc Committee on Transplantation which met in late 1984 and early 1985. The MSMS Committee was composed of 15–20 physicians, all Michigan practitioners, with expertise in heart, heart-lung, liver, pancreas, or bone-marrow transplantation. These physicians, while knowing more about alcoholism than the general public, did not, on the evidence presented herein, have significant personal experience with or empirical evidence of the recidivism of alcoholics. The MSMS Committee established subcommittees on each of the organ categories, with each subcommittee drafting separate patient need and patient selection criteria. The subcommittee drafts were submitted to the MSMS Committee as a whole, where they were modified and approved. The MSMS Committee then presented the final patient selection criteria to the Governor's Office of Medical Affairs in April, 1985.

In September, 1985, the Michigan Department of Public Health (DPH) convened its own Ad Hoc Committee for extrarenal organ transplantation. The DPH Committee consisted primarily of members of the MSMS Committee. It also included several DSS officials as well as doctors with no previous affiliation with the MSMS Committee. No experts on alcoholism were members of this group. It is apparent from the minutes of the DPH Committee meetings that the criteria developed by the MSMS Committee were extensively relied upon in formulating the DPH's Committee's patient selection criteria, which were issued in October, 1985.

Both committees shared a critical weakness: they lacked adequate support from the State of Michigan. The State provided no permanent staff for either committee. This deficiency caused the committee members to act in a vacuum. No statistical data was made available from transplant centers around the country, nor did the committee request or receive any information from states or transplant centers experienced in transplant requests from indigents. The doctors and other committee members were forced to rely on their own experience with alcoholics, which was generally anecdotal in nature. By not providing adequate resources, the State substantially impaired the committees' ability to formulate rational patient selection criteria.

The DSS uses the criteria, including the two-year alcohol abstinence requirement, to evaluate applicants for prior authorization of medicaid funds for liver transplants. The DSS also established a procedure for their use. Prior authorization applications and accompanying informational material are distributed to a panel of eleven reviewing physicians. The DSS then contacts three to five members of the panel, depending upon availability and the expertise of the reviewing doctors and obtains their respective recommendations. The DSS then acts on the applications.[6]

At trial, the parties disputed the significance of the two-year abstinence require-

---

6. This procedure was approved by the DSS appropriation subcommittees of the Michigan House of Representatives and the Michigan Senate pursuant to Act of July 31, 1985, Pub. Act. No. 117, 83rd Leg., 1985 Mich. Leg. Service No. 5 at 265, 292.

ment. The DPH criteria include substance abuse as an absolute contraindication to liver transplantation and also state that alcoholic cirrhosis is a specific disease state permitting a liver transplant only if the patient has abstained for two years. Several DSS officials testified that these criteria were flexible and that reviewing doctors could approve a prior authorization despite the criteria. Deposition testimony reveals, however, that the DSS did not impress the flexibility of these criteria on the reviewing physicians, nor did it convey to the consulting physicians the manner in which the criteria were to be applied. As a result, the reviewing physicians felt prescribed by the criteria and applied them woodenly.

The physicians' recommendation does not end the patient selection process. DSS officials can decide not to accept the physicians' conclusions. Testimony by DSS officials demonstrated, however, that the DSS paid complete deference to the physicians' judgment. The loose, informal and uncoordinated formulation of criteria, the failure to establish guidelines for the use of the criteria and the mechanical application of the criteria reveal serious legal flaws in the DSS prior authorization process.

It is uncontradicted that heavy consumption of alcohol is a legitimate medical concern. First, alcohol consumption detrimentally affects the body's pulmonary system, sometimes causing a prospective liver donee to be too weak for transplant surgery. In regard to this concern, uncontradicted testimony showed that a period of far less than two years was necessary to eliminate alcohol's effects on the pulmonary system.

Second, recidivism to alcoholism may cause a liver donee to fail to maintain the regimen necessary to complete a successful recovery from the operation and may also deleteriously affect the body's immunological system. Although the evidence indicates that longer abstinence decreases the chances of recidivism, the defendants have not shown that the two-year abstinence requirement adequately addresses the crit-

ical condition of potential liver transplant donees. Uncontradicted testimony showed that a two-year abstinence requirement screens out an entire class of otherwise qualified liver transplant applicants. If a potential donee could survive two years without a transplant, the donee did not need the transplant in the first place. Conversely, virtually all alcoholic cirrhotics requiring a transplant would die before completing their two-year period of abstinence or would develop such severe complications that an operation would be unsafe.

Finally, uncontradicted testimony was presented at trial that liver availability has increased dramatically in Michigan. No shortfall presently exists, and none will occur in the foreseeable future. Testimony also indicated that Michigan's recently-passed "required request law,"[7] should further increase liver availability.

## CONCLUSIONS OF LAW

Initially the court faces the issue of jurisdiction. Federal courts are courts of limited jurisdiction and may decide disputes only if a case or controversy exists. U.S. Const. art. III, § 2, cl. 1. The defendants contend in the instant case that no such case or controversy exists.

In determining whether Allen's claim is a justiciable "case or controversy," the court must look to the concreteness of the dispute:

A "controversy" in this sense must be one that is appropriate for judicial determination. A justiciable controversy is thus distinguished from a difference or dispute of a hypothetical or abstract character; from one that is academic or moot. The controversy must be definite and concrete, touching the legal relations of parties having adverse legal interests. It must be a real and substantial controversy admitting of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts.

---

7. Act of July 7, 1986, Pub. Act. No. 186, 83rd Leg., 1986 Mich. Leg. Service No. 4 at 252. The Act provides that hospitals are required to re- quest certain individuals' "consent to the gift of all or any" organs of a related deceased person.

*Aetna Life Ins. Co. v. Haworth,* 300 U.S. 227, 240–41, 57 S.Ct. 461, 464, 81 L.Ed. 617 (1937) (citations omitted). Justiciability is "not a legal concept with a fixed content or susceptible of scientific verification. Its utilization is the resultant of many subtle pressures ..." *Poe v. Ullman,* 367 U.S. 497, 508, 81 S.Ct. 1752, 1758–59, 6 L.Ed. 989 (1961); *Gilligan v. Morgan,* 413 U.S. 1, 9–10, 93 S.Ct. 2440, 2445–46, 37 L.Ed.2d 407 (1973). According to one commentator, focus on the hardship of denying review, the suitability of the issues for judicial review, and the capacity of classes of litigation for presenting the issues are considerations that have been examined together to determine whether a particular claim is justiciable. Wright, Miller and Cooper, *Federal Practice and Procedure,* § 3529 at 288 (citing *Gilligan, supra*). The most important criteria are "appropriateness of the issues for decisions by courts and the hardship of denying judicial relief." *Joint Anti–Facist Refugee Comm. v. McCarthy,* 341 U.S. 123, 156, 71 S.Ct. 624, 640, 95 L.Ed. 817 (1951); *Abbott Laboratories v. Gardner,* 387 U.S. 136, 147, 87 S.Ct. 1507, 1514–15, 18 L.Ed.2d 681 (1967); *Pacific Gas & Elec. v. Energy Resources Comm'n.,* 461 U.S. 190, 201, 103 S.Ct. 1713, 1720–21, 75 L.Ed.2d 752 (1983); *Young v. Klutznick,* 652 F.2d 617, 625 (6th Cir.), *cert. denied* 455 U.S. 939, 102 S.Ct. 1430, 71 L.Ed.2d 650 (1981).

More recent cases have also emphasized the concreteness of the dispute:

> The difference between an abstract question and a "case or controversy" is one of degree, of course, and is not discernible by any precise test. The basic inquiry is whether the "conflicting contentions of the parties ... present a real, substantial controversy between parties having adverse legal interests, a dispute definite and concrete, not hypothetical or abstract."

*Babbitt v. United Farm Workers,* 442 U.S. 289, 297–98, 99 S.Ct. 2301, 2308–9, 60 L.Ed. 2d 895 (1979) (citations omitted). The Supreme Court has also recently restated the goals behind the "ripeness" determination:

> The basic rationale of the ripeness doctrine "is to prevent the courts, through the avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference with an administrative decision has been formalized and its affects felt in a concrete way by the challenging parties."

*Pacific Gas & Elec., supra,* 461 U.S. at 200, 103 S.Ct. at 1720 (citing *Abbott Laboratories, supra,* 387 U.S. at 148–49, 87 S.Ct. at 1515–1516).

█ Under these standards, the issues presented by Allen's complaints are ripe for adjudication. The defendants argue that at the time of the first application, Allen's own doctors were not prepared to transplant. Prior authorization, however, is designed to assure funding before a medical procedure takes place. In Allen's case, it was prudent to start the application process early because his need for a transplant could become critical at any time.

Second, the July 29, 1986 denial does not indicate that its basis was Allen's physician's decision to delay the transplant operation. Rather, it is clear the State rejected the application because of the two-year abstinence requirement. This denial was a formalized administrative decision felt in a concrete way by the plaintiff.

Third, applying the standards for ripeness directly, this dispute is clearly justiciable. The patient selection criteria exist and the state applied them to a specific person whose legal rights were affected. Determining the reasonableness of the criteria is appropriate for judicial determination. Also, denying judicial relief would be extremely harsh. Allen's condition could deteriorate rapidly at any time. Refusing to adjudicate this dispute could seriously endanger the plaintiff's life. Finally, the defendants invited Allen to reapply for prior authorization funding. At the court's insistence, Allen did so. The defendants cannot reasonably argue that the court should not consider an action taken at the defendants' suggestion. At the time of reapplication, Allen's physicians were prepared to proceed with a liver transplant if the funding

was forthcoming.[8] After the conclusion of proceedings before this court, the DSS issued its second denial, also based on Allen's history of substance abuse. No doubt can remain that Allen's claims are justiciable. The court now turns to the substance of the plaintiff's challenge to the patient selection criteria.

The Medical Assistance Program (Medicaid), Title XIX of the Social Security Act, 79 Stat. 343, 42 U.S.C. § 1396 *et seq.*, is a federal-state cooperative program designed to provide medical assistance to the indigent. Medical services are provided by medical institutions to eligible persons, and the state makes payments to the medical institution for the care provided. M.C.L.A. § 400.1116. The federal government in turn reimburses the state for a substantial portion of the State Medicaid expenditure. 42 U.S.C. § 1396b. As a condition for federal reimbursement, the state must conform to federal statutory and regulatory requirements. *Smith v. Miller*, 665 F.2d 172, 175 (7th Cir.1981); *Ohio v. Rhodes*, 477 F.Supp. 529, 535 (S.D.Oh.1979).

Medicaid offers numerous categories of federally reimbursable services, including in-patient hospital and physician services. 42 U.S.C. § 1396a(a)(1)-(5). Although Medicaid does not require funding for all medical treatment falling within these categories, state medicaid plans "must establish reasonable standards ... for determining ... the extent of medical assistance under the plan which ... are consistent with the objectives of [Medicaid]." 42 U.S.C. § 1396a(a)(17). In finding that Medicaid did not obligate states to fund nontherapeutic abortions, the Supreme Court established the federal statutory objective against which state Medicaid plans must be measured:

> Although serious statutory questions might be presented if a state Medicaid plan excluded necessary medical treatment from its coverage, it is hardly in-

consistent with the objectives of the Act for a State to refuse to fund unnecessary —though perhaps desirable—medical services.

*Beal v. Doe*, 432 U.S. 438, 444–45, 97 S.Ct. 2366, 2370–71, 53 L.Ed.2d 464 (1977) (emphasis removed). Although a state has substantial discretion to choose the proper mix of amounts, scope, and duration limitations for the services offered in its Medicaid plan, 42 C.F.R. § 440.230(b), the care and services provided must be in "the best interests of the recipients." 42 U.S.C. § 1396a(a)(19); *Alexander v. Choate*, 469 U.S. 287, 303, 105 S.Ct. 712, 721, 83 L.Ed.2d 661 (1985). Finally, 42 C.F.R. § 230(c) also serves to identify the goals of Medicaid:

> The Medicaid agency may not arbitrarily deny or reduce the amount, duration or scope of a required service ... to an otherwise eligible recipient solely because of the diagnosis, type of illness or condition.

Thus, the medical necessity of the procedure is the touchstone for evaluating the reasonableness of standards in state medicaid plans. *See, Pinneke v. Preisser*, 623 F.2d 546, 548 n. 2 (8th Cir.1980).

Courts have found that a state's refusal to provide medically necessary therapy to be arbitrary. In *Meyers v. Reagan*, 776 F.2d 241 (8th Cir.1985), the treating physician and speech pathologist both stated that the plaintiff required an electronic speech device to "communicate effectively." *Id.* at 244. An appellate panel held that where the state has offered to provide physical therapy, it could not exclude electronic speech devices from medicaid coverage. In *Pinneke v. Preisser*, 623 F.2d 546 (8th Cir.1980), the court examined a state's denial of funding for a sex reassignment operation. After find that "radical sex conversion surgery is the only medical treatment available to relieve or solve the problems of a true transexual," [9] *Id.* at 548, the

---

**8.** Defendants interpret documents related to the reapplication to show that the treating surgeon has not made a final decision to operate. The court determines that the treating surgeon did not wish to set a date without actually seeing the patient again, but once he does see him, the

surgeon will be ready to do so. The surgeon reiterated that Allen needed a transplant.

**9.** *But see Rush v. Parham*, 625 F.2d 1150 (5th Cir.1980) (finding sex conversion surgery to be

court found the state's refusal to fund violative of Medicaid:

> [A] state plan absolutely excluding the only available treatment known at this stage of the art for a particular condition must be considered an arbitrary denial of benefits based solely on the "diagnosis, type of illness or condition."

*Id.* at 549. *See also Hillburn v. Maher*, 795 F.2d 252, 256–57 (2d Cir.1986) (discussing lower court opinion ordering Connecticut to provide adaptive wheelchairs because of medical necessity).

■ The court finds, and it is not disputed by the defendants, that Allen's proposed liver transplant surgery is a medically necessary procedure. This operation is the only treatment available to resolve his liver disease, and it is not experimental in nature. This court now must determine whether Michigan has established reasonable standards for obtaining this service.

■ The essence of this action is the reasonableness of the DSS patient selection criteria. Throughout the proceedings the defendant has attempted to shift the focus of the litigation from this issue to Allen's medical suitability for a liver transplant. What is at issue is not Allen's suitability but rather the criteria used in making the suitability determination. Thus, the court concentrates on the patient selection criteria. If they are arbitrary or unreasonable, the court must find that the criteria violate Medicaid standards.

The court concludes that the two-year abstinence requirement is arbitrary. The DSS never provided the MSMS or DPH committees with adequate staff or resources to make a rational, scientific decision as to the proper length of abstinence. Without statistical data, reports from other states' health agencies, and like information, the committees were in no position to make such a determination.[10] The State also did not appoint an expert on alcohol-

ism and recidivism as a member of the committee. Faced with a lack of expertise and statistical data, and ignorant of the experience of other states, the committees were forced to rely on anecdotal information. The defendants did not present any evidence as to the reasons for the failure to provide any of the relevant and material information indisputably necessary to formulate valid criteria in such a delicate field as organ transplantation.

The Court also concludes that the two-year abstinence requirement is unreasonable. Technically, the DSS has not absolutely precluded liver transplants, since applicants meeting the DPH criteria may obtain prior authorization. In fact, however, the two-year abstinence requirement precludes a large group of potential applicants from ever obtaining transplantations. This group of alcoholic cirrhotics either will not survive the two-year period or will not require the transplant by reason of their survival. This *de facto* preclusion of former alcoholics from treatment because of their condition and diagnosis is unreasonable and therefore violative of medical requirements.

Finally, the evidence made apparent that the patient selection criteria are a constantly shifting pattern of requirements. The second denial, for example, demands a psychiatric evaluation by a particular specialist. No such requirement exists in the DPH patient selection criteria. Furthermore, the criteria do not indicate that the substance abuse concerns expressed in the criteria could be removed through such an evaluation. A demand for psychiatric evaluation is not necessarily unreasonable. It is the type of requirement that might well have been included in the criteria in the first instance. Under these circumstances, however, an applicant cannot know what information is necessary for a successful prior authorization. Such uncertainty is

---

experimental and need not be covered by Medicaid.)

10. Data was available in this area. Doctors at the University of Pittsburgh, for example, have transplanted over 800 livers, including 19 involving alcoholic cirrhotics. In fact, there ap-

pears to be no required abstinence period of any duration at the University of Pittsburgh, by far the largest liver transplant center in the United States. The University of Chicago prefers a six-month abstinence period but will waive it.

unreasonable and violative of Medicaid standards.

The defendants argue that Medicaid allows states to structure their programs to contain costs. They base their position on the Medicaid requirement that state medicaid plans "safeguard against the unnecessary utilization of such care and services and to assure that payments are consistent with efficiency, economy, and quality of care." 42 U.S.C. § 1396a(a)(30)(A). Medicaid regulations also have a similar provision:

> The agency may place appropriate limits on a service based on such criteria as medical necessity or on utilization control procedures.

42 C.F.R. § 440.230(d).

Defendants' reliance on these provisions is misplaced. Cost containment through utilization control was not intended to restrict necessary medical procedures. Congress was instead concerned that patients remain in hospitals, for example, only as long as necessary, and that patients should move to other facilities which could "provide less expensive, but equal, care." S.Rep. No. 404, 89th Cong., 1st Sess. (1965) *reprinted in* [1965] U.S.Code Cong & Ad. News 1943, 1987. Procedures to promote utilization control cannot justify precluding funding of medically necessary procedures.

Before this court are also plaintiff's claims based on violations of the Fourteenth Amendment and the Michigan Administrative Procedures Act. Federal courts have a "strong duty to avoid constitutional issues that need not be resolved in order to determine the rights of the parties to the case under consideration." *Ulster County Court v. Allen,* 442 U.S. 140, 154, 99 S.Ct. 2213, 2223, 60 L.Ed.2d 777 (1979); *see also New York Transit Authority v. Beazer,* 440 U.S. 568, 582–83, 99 S.Ct. 1355, 1364–65, 59 L.Ed.2d 587 (1979). Likewise, because the plaintiff has not exhausted administrative remedies available in the DSS, the court will not rule on the Michigan Administrative Procedures Act. *Attorney General v. Diamond Mortgage Company,* 414 Mich. 603, 610–11, 327 N.W.2d 805 (1982).

In summary, the court finds that Allen's liver transplant procedure is medically necessary. While the Court cannot determine Allen's medical suitability for transplant, the Court finds that the two-year abstinence requirement is arbitrary and unreasonable as formulated and applied. Therefore, the court orders the defendants to approve a prior authorization of medicaid funding for Jeffrey Allen's liver transplantation procedure at the University of Chicago Hospital.

IT IS SO ORDERED.